UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

―――――――――――

In re:                                                           Case No. GG 08-09092
                                                                 Chapter 11
GAINEY CORPORATION, et al.,                                      (Jointly Administered)

        Debtors.

_____/

BARRY P. LEFKOWITZ,
as Liquidation Trustee of the Gainey
Companies Liquidation Trust,

                                                                 Adversary Proceeding
        Plaintiff,                                       No. 10-80483

v.

MICHIGAN TRUCKING, LLC, f/k/a
Michigan Truck Acquisition, LLC, d/b/a
M Trucking, LLC,

        Defendant.

_____/

**CORRECTED\***
**OPINION REGARDING DEFENDANT'S MOTION**
**TO DISMISS FOR FAILURE TO STATE A CLAIM**

Appearances:

Judith Greenstone Miller, Esq., Southfield, Michigan, attorney for Plaintiff.
Michael S. McElwee, Esq., Grand Rapids, Michigan, attorney for Defendant.

## I. ISSUE.

Has Barry P. Lefkowitz (the "Liquidation Trustee" or "Trustee") stated a valid cause of action against Michigan Trucking LLC ("Michigan Trucking") to recover damages, or for a declaratory judgment regarding recovery of possible damages, arising from preconfirmation tort claims asserted, or that may be

_____

\* This opinion simply corrects the date the opinion was entered by the court, specifically the year. The date of the opinion should have been May 6, 2011, not May 6, 2010.

asserted, by third persons, such as insurance companies?  When does a tort claim, or loss, first arise:  when the tort or loss occurred or when the request or demand for payment is made upon an insurance company which provides coverage for an accident or a loss?  Should the Liquidation Trustee's complaint be dismissed for failure to state a cause of action?  FED. R. BANKR. P. 7012 (incorporating by reference FED. R. CIV. P. 12(b)(6)).

## II. JURISDICTION.

The court determines it has subject matter jurisdiction over *this* particular adversary proceeding.  28 U.S.C. § 1334; see Discussion, Part IV.A. below.  The complaint is a core proceeding and this court may issue an appropriate order or judgment.  28 U.S.C. § 157(b)(2)(A) (matters concerning estate administration), (L) (confirmation of plans), (N) (orders approving sales of property of the estate) and (O) (other proceedings involving liquidation of estate assets).  The base case and this adversary proceeding have been referred to the bankruptcy court for decision.  28 U.S.C. § 157(a); L.R. 83.2(a) (W.D. Mich.).  In this proceeding, the court is called upon to review and interpret its prior final orders relating to the sale of estate property to Michigan Trucking and the effect of confirmation of the Gainey Corporation and its related corporations' (the "Debtors"),[1] chapter 11 plan.

---

[1]  The Debtors are Gainey Corporation (Case No. 08-09092), Gainey Transportation Services, Inc. (Case No. 08-09094), Super Service, Inc. (Case No. 08-09096), Freight Brokers of America, Inc. (Case No. 08-09109), Lester Coggins Trucking, Inc. (Case No. 08-09095), and Gainey Insurance Services, Inc. (Case No. 08-09097).

## III. PROCEDURAL BACKGROUND AND UNCONTESTED FACTS

A.  *Base Case Background and Prior Court Orders.*

On October 14, 2008, the Debtors filed their voluntary petition under chapter 11 of the Bankruptcy Code.[2]  On October 13, 2009, the Debtors filed their First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Plan").  (Case Dkt. No. 1506.)  On December 31, 2009, the court confirmed the Debtors' Plan, with modifications (the "Confirmation Order").  (Case Dkt. No. 1749.)  Before confirmation, a joint motion to establish a liquidation trust was filed.  The establishment of a trust (the "Trust") and the identity of the Liquidation Trustee were approved on November 25, 2009.  (Case Dkt. No. 1669.)  Subsequently, on December 31, 2009, the Debtors' remaining assets, not previously sold before confirmation, were transferred to the Trust upon entry of the Confirmation Order.

Shortly before confirmation of the Debtors' Plan, the Debtors sought authority to sell substantially all of their assets.  (Case Dkt. No. 1500.)  An auction sale was held on November 16, 2009, and Michigan Trucking was determined to have submitted the highest and best offer at the sale.  On November 19, 2009, after written objections were filed by certain parties, and then resolved, the court entered an order approving the sale of substantially all of the Debtors' assets to Michigan Trucking (the "Sale Order").  (Case Dkt. No. 1652.)  In connection with the Sale Order, the Debtors sought and received

---

[2]   The Bankruptcy Code, as amended, is set forth in 11 U.S.C. §§ 101-1532 inclusive.  The specific provisions of the Bankruptcy Code are referred to in this opinion as "§ ___."

3

authority to assume and assign specific executory contracts and unexpired leases set forth in an Asset Purchase Agreement ("APA") which was attached to and incorporated in the Sale Order. In accordance with the Sale Order, the sale was consummated and closed on December 22, 2009. (Trustee's Complaint, ¶ 18.)

Michigan Trucking paid $77,800,000 for substantially all of the Debtors' assets. Michigan Trucking purchased "all Contracts of the [Debtors], other than the rejected Contracts, entered into prior to the Bid Deadline . . . including [certain designated contracts]." Sale Order, APA, § 2.1(a)(iii). The assets purchased by Michigan Trucking included certain assumed insurance contracts. Sale Order, APA, § 2.1(a)(iii)(A); § 2.1(a)(iii)(A)(11). The insurance contracts included coverages for bodily injuries and property damage, "that occurred during the policy year of 6/1/2009 through 5/31/2010." Response of the Liquidation Trustee to Michigan Trucking LLC's Motion to Dismiss for Failure to State a Claim ("Trustee's Response"), ¶ 15. (A.P. Dkt. No. 21.) Michigan Trucking also purchased "all credits, prepaid expenses, deferred charges, deposits, advances and prepayments, rights under warranties and guaranties, rights in respect of promotional allowances, vendor rebates and other refunds, owned or held for the benefit of [Debtors]" denominated as "Prepaid Expenses." Trustee's Response, ¶ 16-17; Sale Order, APA, § 5.1(a)(vii).

Based upon the above, a question has been raised about the intended use of collateral that was previously given by the Debtors to certain insurance companies which collateral could be drawn down to satisfy, or partially satisfy,

4

the Debtors' obligations to pay the deductible amounts (or other permitted charges under the various insurance policies). The Trustee asserts that Michigan Trucking received the right to and use of the insurance companies' collateral linked together with the burdens under the policies, e.g., paying the reimbursement deductible amounts. Trustee's Response, ¶ 17. The Trustee states "the prepaid amount should be used to pay the reimbursable deductible obligations *when they actually become due.*" Id. (emphasis added).

As noted by the Trustee, Michigan Trucking has undertaken the Debtors' prior obligation "to administer all claims, including pre-closing claims that are or were covered by insurance, for the benefit of the Debtors' estate, at no expense to the estate." Trustee's Response, ¶ 17; Sale Order, APA, §10.2(b). Therefore, another issue faced by this court, within the meaning of the Sale Order and the Confirmation Order, is whether "administering" insurance claims includes the obligation to pay the insurance deductible amounts resulting from the Debtors' preconfirmation accidents or losses.

The APA states that Michigan Trucking "shall not assume or pay, perform or discharge, nor shall [Michigan Trucking] be responsible, directly or indirectly, for any other debts, obligations, accounts, or trade payables, contracts or liabilities of [the Debtors]." Michigan Trucking asserts it assumed or agreed to pay the Debtors' liabilities and obligations "only to the extent such liabilities and obligations *first arise and are related to periods subsequent to the closing* [of the

5

sale]."  Sale Order, APA, § 2.4(a)(1) and (c).[3]  Also, in the Sale Order itself, without reference to the APA, the court stated that Michigan Trucking "shall not be liable for any claims against the Debtors . . . now existing or hereafter arising, whether asserted or unasserted . . . arising prior to the Closing Date."  Sale Order, ¶ 24.  According to Michigan Trucking, the Sale Order also enjoined claimants "from commencing or continuing in any manner any action or other proceeding . . . against the Purchaser [i.e., Michigan Trucking]."  Sale Order, ¶ 23.

In addition to relying upon the various provisions in the Sale Order, and the APA provisions incorporated in that order, Michigan Trucking also relies on the explicit language in the Plan and the Confirmation Order.

To promote and achieve confirmation of a chapter 11 plan, the Debtors, Wachovia Bank (for itself and as agent for a number of other entities, referred to as the "Lenders"), and the Creditors' Committee (represented by the same law firm that now represents the Liquidation Trustee) negotiated plan provisions that are pertinent to the current complaint filed by the Trustee.  "Excluded" assets, otherwise subject to the Lenders' blanket liens, were carved out to be conveyed to the Liquidation Trust.  The agreed amount of cash to be conveyed to and retained by the Liquidation Trustee was $5,000,000 (the "carve out").  This carve out would be used to administer the trust and pay creditors' claims.  Plan, § 2.2; Base Case Dkt. No. 1506.  Also, the money received by the Liquidation Trust

---

[3]    The Trustee asserts that to be an "excluded" liability (not to be paid by Michigan Trucking) the obligation "must first arise prior to the closing *and* it must relate to a period *prior* to the closing."  Trustee's Response, ¶ 40.

6

would be used to pay in full "liabilities incurred in the ordinary course of business by the Debtors post-petition as of the [effective date of confirmation]." Plan, § 2.2; Base Case Dkt. No. 1506. The time for these requisite payments was the "later of the [effective date of confirmation] or *pursuant to their ordinary business terms*." Id. (emphasis added). Michigan Trucking therefore asserts that the obligation to pay insurance deductibles arising from pre-Sale Order torts or other losses, such as cargo damage claims or other liabilities arising from accidents, is not its responsibility. Motion to Dismiss, ¶ 29.

B.     *Adversary Proceeding Background and Prior Court Orders.*

Before the filing of this adversary proceeding, the Liquidation Trustee, through his attorneys, attempted to obtain relief in the base case by filing a motion. Liquidation Trustee's Motion to Compel Michigan Truck Acquisition, LLC to Pay Certain Post-Closing Property Damage Claims Under the Court Approved Asset Sale and Purchase Agreement; Case Dkt. No. 1906. In its response to the Liquidation Trustee's motion, Michigan Trucking asserted the motion was procedurally improper and asserted an adversary proceeding was required. FED. R. BANKR. P. 7001. The court agreed and the Trustee's motion was dismissed without addressing the merits of the dispute. (Case Dkt. No. 2063.)

On July 18, 2010, the Liquidation Trustee filed his complaint in this adversary proceeding (sometimes referred to as the "A.P."). (A.P. Dkt. No. 1.) The "Complaint for Declaratory Judgment and Other Relief" (the "Complaint") alleges breach of contract and seeks a declaratory judgment that Michigan Trucking must pay certain obligations in accordance with provisions in the Sale

7

Order, the APA, the Plan, and the Confirmation Order.  Succinctly stated, the Liquidation Trustee seeks a declaration that Michigan Trucking is required to pay obligations for tort (such as accident and cargo damage) claims that occurred prior to the sale closing but were not first asserted by the tort claimants until after entry of the Sale Order.

According to the Liquidation Trustee:  "While the accidents that triggered the creation of the [tort obligations] may have occurred prior to the [closing of the sale, i.e., on December 22, 2009], Michigan Trucking's sole obligation is to pay the insurer the Reimbursement Obligation -- in other words, the Deductible Amount subject to the Deductible Endorsement paid by the insurer under the Assumed Insurance Contracts."  Complaint, ¶ 38.  (The "Assumed Insurance Contracts" are set forth in the APA on Schedule 2.1(a)(iii)(A)(11); Complaint, ¶s 20 and 21.)  Further, the Liquidation Trustee alleges "Michigan Trucking is required to administer and submit all liability claims that may arise under the Assumed Insurance Contracts to the insurer for the applicable Debtors for the Policy Year [June 1, 2009 to May 31, 2010]."  Complaint, ¶s 23 and 44.  The upshot of the Liquidation Trustee's allegations is that Michigan Trucking's obligation to "administer" liability claims is tantamount to an obligation to "pay" all the insurance policies' deductible amounts.  Complaint, ¶ 39 (because the insurer has not settled or paid obligations the required payment of the deductibles will not "first arise" until after the closing of the sale).  The Liquidation Trustee believes that the "Deductible Amount under the Assumed Insurance

8

Contracts [is] either $10,000 per claim or such amount to be determined by the insurer and the insured." Complaint, ¶ 33 (internal quotation marks omitted).

Rather than filing an answer to the Complaint, a motion was filed in response. Michigan Trucking, LLC's Motion to Dismiss for Failure to State a Claim (herein "Motion to Dismiss"). FED. R. BANKR. P. 7012(b) (incorporating FED. R. CIV. P. 12(b)(6) ("failure to state a claim upon which relief can be granted")). In its Motion to Dismiss, Michigan Trucking interprets this court's prior orders much differently than does the Liquidation Trustee. It is argued that "[a]ll of the participants in the [sale] transaction . . . agreed that Michigan Trucking was not liable for any of the Debtor's pre-closing obligations or for any acts or events occurring prior to closing." Motion to Dismiss, ¶ 3 (emphasis in original).

Michigan Trucking relies upon specific language in the APA and the Sale Order. Importantly, the APA states that Michigan Trucking "shall not assume or pay, perform or discharge, nor shall [Michigan Trucking] be responsible, directly or indirectly, for any other debts, obligations, accounts or trade payables, contracts or liabilities of any Seller." APA, § 2.4(a)(i) and (c). Michigan Trucking, as buyer, agreed to pay or assume the Debtors' obligations "only to the extent such liabilities and obligations first arise *and are related to periods subsequent to closing.*" Id. (emphasis added). Equally relevant is the express Sale Order language which states that Michigan Trucking "shall not be liable for any claims against the Debtors . . . now existing or hereafter arising, whether asserted or unasserted . . . arising prior to the Closing Date [i.e. December 22, 2009]." Sale Order, ¶ 24.

9

Michigan Trucking, in persuasive support of its argument, also relies upon the Plan and the Confirmation Order. After the chapter 11 case was filed and before the sale closing date, the Debtors operated their trucking business. During this period, a number of accidents happened and cargo losses occurred. These types of incidents (or related omissions) are, or may be characterized as, postpetition tort claims. The Plan covers these types of claims:

> Allowed Administrative Expense Claims representing *liabilities incurred in the ordinary course of business by the Debtors postpetition* as of the Effective Date, to the extent not already paid by the Debtors prior to the Effective Date, *shall be paid by the Liquidation Trustee from the Excluded Cash* on the later of the Effective Date or pursuant to their ordinary business terms.

Plan, § 2.2 (emphasis added).

The "Excluded Cash" is the $5,000,000 carve out that was transferred from the Lenders' collateral to the Debtors to partially fund the Liquidation Trust. Plan, § 1.45. The administrative expenses paid, or to be paid, by the Liquidation Trust include "any actual and necessary costs and expenses of operating" the Debtors' business and "any indebtedness or obligations incurred or assumed by the Debtors under the Plan in connection with the conduct of their businesses." Plan, § 1.3.

Based upon interpretation of the language in the governing court orders, most particularly the Sale Order and the Confirmation Order (which respectively incorporate by reference the APA and the Plan), it is easy for the court to find that Michigan Trucking is *not* obligated to pay any of the Debtors' pre-closing obligations whatsoever.

10

The pre-closing obligations include those liabilities arising from the occurrences of accidents and cargo losses.  As explained below, and contrary to the Liquidation Trustee's somewhat convoluted argument, the pre-closing claims also include the deductible amounts to be paid under the Debtors' various insurance policies that were transferred to Michigan Trucking.  That being said, Michigan Trucking is responsible, and the court believes it does not contest its liability, for torts occurring and claims first arising on, or *after*, December 22, 2009, i.e., the sale closing date.

IV.  DISCUSSION.

A.      *Subject Matter Jurisdiction to Interpret Prior Court Orders.*

"The source of the bankruptcy court's jurisdiction is 28 U.S.C. §§ 1334 and 157." Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.), 372 F.3d 154, 161 (3d Cir. 2004) (quoting United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.), 301 F.3d 296, 303 (5th Cir. 2002)).  As long as an adversary proceeding or contested matter is sufficiently "related to" the bankruptcy case, subject matter jurisdiction exists.  28 U.S.C. § 1334(a) and (b); 28 U.S.C. § 157(a); Mich. Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1141 (6th Cir. 1991) (in assessing whether jurisdiction exists "it is necessary only to determine whether [the] matter is at least 'related to' the bankruptcy").

After a chapter 11 plan is confirmed, whether continued subject matter jurisdiction continues becomes far hazier and less straightforward.  Resorts Int'l, 372 F.3d at 164-65 (after confirmation, "retention of bankruptcy jurisdiction may

be problematic"); Holly's Inc. v. City of Kentwood (In re Holly's, Inc.), 172 B.R. 545, 554 (Bankr. W.D. Mich. 1994) (the "confusion [of the jurisdictional scheme] is magnified when the courts confront the issue of the bankruptcy court's postconfirmation jurisdiction"), aff'd, 178 B.R. 711 (W.D. Mich. 1995).

In examining postconfirmation subject matter jurisdiction "the essential inquiry appears to be whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." Thickstun Bros. Equip. Co., Inc. v. Encompass Servs. Corp. (In re Thickstun Bros. Equip. Co., Inc.), 344 B.R. 515, 521 (Bankr. 6th Cir. 2006) (quoting Resorts Int'l, 372 F.3d at 166-67). To the contrary, from a statutory perspective, when "the court determines that [a] proceeding falls outside the language of 28 U.S.C. § 1334, then the court may *not* render a decision on the merits." Holly's, Inc., 172 B.R. at 556 ("[A] bankruptcy court need only determine whether the proceeding falls *outside* the parameters of bankruptcy jurisdiction, as defined by 28 U.S.C. § 1334.") (emphasis in original).

This court believes postconfirmation subject matter jurisdiction will always exist when a bankruptcy court is called upon to interpret its prior orders. Most, if not all, knowledgeable bankruptcy persons would consider this axiomatic. See, e.g., Resorts Int'l, 372 F.3d at 168-69 ("[W]here there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan . . . retention of post-confirmation bankruptcy court jurisdiction is normally appropriate."); Thickstun Bros, 344 B.R. at 522 ("It is difficult to imagine a closer

12

nexus to [a debtor's] bankruptcy case and [a] confirmed [p]lan than [a] direct request for interpretation and clarification of the [p]lan's terms."). Even those courts which view postconfirmation jurisdiction more restrictively agree that subject matter jurisdiction continues if it "bear[s] on the interpretation or execution of the debtor's plan." Bank of La. v. Craig's Stores of Texas, Inc. (In re Craig's Stores of Texas, Inc.), 266 F.3d 388, 391 (5th Cir. 2001).

This court is called upon to interpret the Confirmation Order in conjunction with its prior Sale Order (which incorporates the APA). Without question, the court determines it has subject matter jurisdiction to decide the merits presented.[4]

**B.**     *Within the Meaning of the Plan and the Sale Order, When Does a Claim "First Arise?"*

The center of the dispute between the Liquidation Trustee and Michigan Trucking is basically the issue of when a claim "first arises." The key language embodied in the APA and incorporated into the Sale Order is that Michigan Trucking only assumed or agreed to pay those debts, obligations or liabilities of the Debtors that "first arise and are related to periods subsequent to the closing of the sale of specific assets by the Debtors to Michigan Trucking." Sale Order, APA § 2.4(a)(1) and (c).

---

[4]     A number of other adversary proceedings involving the Liquidation Trustee have been filed and are pending, most notably a large number of preference avoidance and recovery actions. Given the unique Plan, Confirmation Order, and the terms of the Liquidation Trust, a separate and discrete analysis of the existence or absence of postconfirmation subject matter jurisdiction may become necessary in the future.

Put into factual context, Michigan Trucking states that when a tort actually occurred, i.e., when an accident or a cargo loss happened, is when the claim "first arises." The Liquidation Trustee uses a different measuring point: he asserts that the claim "first arises" when the request or demand is first made to the insurance company, regardless of when the accident or loss occurred. Therefore, it is the Trustee's assertion that Michigan Trucking is liable (and thereby obligated to pay applicable insurance deductibles) in those instances when the accident or loss occurred prior to closing of the sale but the insurance reimbursement request or demand is first made after closing of the sale.[5]

---

[5] The Trustee's Complaint does not allege the specific facts or the instances when these types of requests or demands were made to the Debtors and/or insurance companies after closing of the sale. However, after the Motion to Dismiss was filed, the Trustee filed a Notice of Filing Supplement to Exhibit "A" to Response of the Liquidation Trustee to Michigan Trucking's Motion to Dismiss for Failure to State a Claim (the "Supplement"). The court has reviewed the voluminous Supplement but has not studied its many pages in great detail. On various charts, invoices, "depletion of deductible" papers, copies of checks, correspondence, handwritten notes, "fax/memo" documents, and photographs of damaged trucks, most which are legible and some which are not, there is information regarding dates of losses, names of insurance companies, claim amounts paid, dates payments were made, amounts of deductibles to be paid by the "insured," and payors and payees on various checks. Rather than attempting to review and summarize the number of insurance claims made, or even count the number of pages in the Supplement, one need only visualize a pile of 8-1/2"x11" papers that aggregate a thickness of approximately 3 inches.

The court has considered requiring the Trustee to file an amended complaint which sets forth "plausible" facts. See Part IV.D. below. However, this would result in substantial expense to the Trustee and would not be of assistance to the court. Also, *the court's decision whether a valid cause of action has been alleged is based upon the interpretation of prior orders.* Therefore, no amended complaint is required in this adversary proceeding. See FED. R. BANKR. P. 1001 ("These rules shall be construed to secure the just, speedy and inexpensive determination of every case and proceeding.").

14

Under the Bankruptcy Code "claim" is a defined term.  It means a:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

§ 101(5)(A) and (B).

Under the Bankruptcy Code a "debt" is likewise a defined term.  A "'debt' means liability on a claim."  § 101(12).  The meaning of "debt" and "claim" are coextensive.  Pennsylvania Dept. of Public Welfare v. Davenport, 495 U.S. 552, 558, 110 S.Ct. 2126, 2130 (1990) ("This definition [of 'debt'] reveals Congress' intent that the meanings of 'debt' and 'claim' be coextensive."); accord Johnson v. Home State Bank, 501 U.S. 78, 84 n.5, 111 S.Ct. 2150, 2154 (1991) ("As we explained in Davenport, 'debt,' which is defined under the Code as 'liability on a claim,' [§ 101(12)], has a meaning coextensive with that of 'claim' as defined in § 101(5).").

The court interprets the language in its prior orders consistently with the interpretation of the Supreme Court in Davenport and Home State Bank. Therefore, when words such as "liabilities," "obligations," "claims," "expenses," "debts," or "amounts" are utilized in the prior court orders, to the extent a word means "claim" or "debt," all these words shall be construed to be coextensive. See, e.g., Sale Order ¶ 24; APA § 2.4(a)(1) and (c), § 5.1(a)(vii), § 10.2(b); Plan § 1.3, § 2.2.  Therefore, if a "claim" is determined to exist before closing of the

15

sale, the "debt," "amount," "liability," "expense," or "obligation" shall also exist pre-closing. To the contrary, if a "claim" first exists post-closing, the "debt," "obligation," or whatever other synonym is used, will also first exist post-closing.

To decide the Motion to Dismiss, the court is called upon to interpret its orders and determine when a claim "first arises," when an "obligation" begins its existence, or when a "liability" is created.

In the context of this dispute, (1) did contingent claims and corresponding contingent debts come into existence before the closing of the sale to Michigan Trucking *or* (2) were the claims and coextensive debts created post-closing when formal demands were first made by accident victims or persons who suffered cargo losses upon the insurance companies to cover the losses, thereby requiring someone to pay the applicable insurance deductible amounts? The answer to this question will determine whether Michigan Trucking shall be declared responsible to pay a large number of deductible amounts. See Trustee's Supplement.

An aberrational opinion decided more than twenty-five years ago supports the Trustee's argument. Avellino & Bienes v. M. Frenville Co., Inc. (Matter of M. Frenville Co., Inc.), 744 F.2d 332 (3d Cir. 1984), overruled by Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.), 607 F.3d 114 (3d Cir. 2010) (en banc).

For purposes of this analysis, the facts involved in Frenville are fairly simple. M. Frenville Co. utilized an accounting firm to prepare certified financial statements for the 1978 and 1979 fiscal years. In July 1980, an involuntary bankruptcy was filed against the Frenville corporate entity. In January 1981, an

16

involuntary bankruptcy was filed against two principals of the corporation, Rudolph Frenville, Sr. and Rudolph Frenville, Jr. In November 1981, after commencement of the Frenville bankruptcy cases, four banks sued the accounting firm for negligence or recklessness for allegedly preparing false financial statements. Based upon their asserted reliance on the financial statements, the banks sought a judgment in a New York state court for losses claimed to be in excess of $5,000,000.

In January 1983, the defendant accounting firm sought to have the automatic stays modified in the Frenville chapter 7 bankruptcy cases. The accounting firms desired to add the Frenvilles as third-party defendants in the New York court proceedings to seek indemnification or contribution from the Frenvilles. Because the liability, if any, of the Frenvilles, arose from their prepetition acts or conduct, the bankruptcy court denied the relief from stay requests. On appeal, the district court affirmed.

On further appeal, the Third Circuit reversed because it determined the automatic stay to be legally inapplicable. Focusing on New York state court procedures, the Third Circuit determined that the accountants' lawsuit against the Frenvilles for indemnity or contribution could not be commenced until the accountants' answer was served in the lawsuit brought by the banks against the accountants. After quoting the meaning of "claim" in § 101 of the Bankruptcy Code, and acknowledging that at "first glance" the accountants appeared to hold "an unliquidated, contingent, unmatured and disputed claim pre-petition," the Third Circuit stated it was required to determine when the "right to payment"

17

arose.  Frenville, 744 F.2d at 336 (the "crucial issue" is when the accountants' right to payment arises because the automatic stay only protects prepetition claims).  Considering New York law and the concept of when third-party actions are "technically ripe," the Third Circuit stated that "[u]ntil the banks instituted suit, however, [the accountants] did not have any claim or cause of action based on indemnity or contribution against the Frenvilles."  Id. at 337.  Based upon this analysis, the Third Circuit decided that that automatic stay was inapplicable to the postpetition third-party lawsuit against the Frenvilles.

After twenty-five years of criticism,[6] the Third Circuit revisited Frenville and, in an en banc decision, reversed it.  Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.), 607 F.3d 114 (3d Cir. 2010).

As a result of Grossman's, the Third Circuit, like other Courts of Appeals,[7] now utilizes the expansive definition of "claim" as contemplated and required by § 101(5).

---

[6]   Grossman's itself acknowledges the criticism.  Grossman's, 607 F.3d at 120 ("A sister circuit has described our approach in Frenville as 'universally rejected.'") (citing Cadleway Props., Inc. v. Andrews (In re Andrews), 239 F.3d 708, 710 n.7 (5th Cir. 2001)).  "At least one bankruptcy court has stated that Frenville 'may be fairly characterized as one of the most criticized and least followed precedents decided under the current Bankruptcy Code.'"  Grossman's, 607 F.3d at 120 (quoting Firearms Imp. & Exp. Corp. v. United Capital Ins. Co. (In re Firearms Imp. & Exp. Corp.), 131 B.R. 1009, 1015 (Bankr. S.D. Fla. 1991)).

[7]   See, e.g., Watson v. Parker (In re Parker), 313 F.3d 1267 (10th Cir. 2002) (holding that legal malpractice claim against chapter 7 debtor arose prepetition, when the conduct giving rise to the claim occurred and therefore, was subject to the debtor's discharge); Cadleway Props., Inc. v. Andrews (In re Andrews), 239 F.3d 708 (5th Cir. 2001) (adopting broad definition of "claim" and holding that creditor retains "right to payment" sufficient to confer standing to appeal adverse rulings regarding its claims, even after creditor's claims have been turned over to sheriff for execution); American Law Ctr. PC v. Stanley (In re Jastrem), 253 F.3d

In Grossman's, Van Brunt purchased products that allegedly contained asbestos from Grossman's, a seller of home improvement and lumber products. Twenty years after the purchase, Grossman's filed for relief under chapter 11. Although there was a published notice (which failed to mention any possible future asbestos liability), Van Brunt did not file a proof of claim in the chapter 11 case. Grossman's plan was confirmed in December 1997; JELD-WEN became the successor-in-interest to Grossman's. In 2006, nearly ten years after plan confirmation, Van Brunt began to show asbestos exposure symptoms. She was diagnosed with mesothelioma, "a cancer linked to asbestos exposure," in March 2007. Grossman's, 607 F.3d at 117.

Van Brunt sued a large number of companies who manufactured products that she had purchased from Grossman's, including JELD-WEN which had acquired Grossman's stock in connection with the confirmed plan and which had subsequently merged with Grossman's. JELD-WEN caused the case to be reopened and sought a determination that Van Brunt's claim was discharged as a result of Grossman's confirmed plan. The bankruptcy court, being bound by Frenville, concluded that Van Brunt's asserted asbestos disease claim arose

___

438 (9th Cir. 2001) (rejecting argument that claim for prepetition attorneys' fees did not arise until after payment of chapter 7 filing fee and holding that claim arose prepetition and was subject to the automatic stay and the debtor's discharge); Epstein v. Official Comm. of Unsecured Creditors (In re Piper Aircraft Corp.), 58 F.3d 1573 (11th Cir. 1995) (rejecting Frenville's "accrued state law claim theory," but concluding that class of claimants with possible future products liability claims against debtor did not hold "claims" under § 101(5)); Woburn Assocs. v. Kahn (In re Hemingway Trans., Inc.), 954 F.2d 1 (1st Cir. 1992) (allowing claim for attorneys' fees incurred defending postpetition CERCLA action, but arising from prepetition indemnification agreement with debtor, as a prepetition unsecured claim).

*after* the plan confirmation and was not discharged because no "claim" accrued until nearly ten years after confirmation. Grossman's, 607 F.3d at 118.

The district court affirmed the bankruptcy court rationalizing, based upon Frenville, that Van Brunt's "tort claims were not 'claims' under 11 U.S.C. § 101(5)." Grossman's, 607 F.3d at 118. The Third Circuit assembled en banc "on a rare occasion" to reconsider Frenville. Grossman's, 607 F.3d at 116-17.

After reviewing the Bankruptcy Code, legislative history, Supreme Court decisions, and other authorities, the Third Circuit stated "Frenville does not account for the fact a 'claim' can exist under the Code before a right to payment exists under state law." Grossman's, 607 F.3d at 121. After discussing various possible implications of a Frenville reversal, including those pertaining to the automatic stay, the possible dischargeability of a claim and the scope of discharge, and due process and notice problems, the lower courts' decisions in Grossman's were reversed and a remand was issued. Grossman's, 607 F.3d at 127-28 ("Whether a particular claim has been discharged by a plan of reorganization depends on factors applicable to the particular case and is best determined by the appropriate bankruptcy court or the district court.").

Returning to this adversary proceeding, to interpret its prior Confirmation Order and Sale Order, this court chooses to use the Bankruptcy Code definitions and persuasive case authority, including Grossman's, by analogy.[8] Therefore,

---

[8] Buttressing the court's analysis is the Plan itself. Plan, § 1.21 ("Claim has the meaning provided in section 101(5) of the Bankruptcy Code."). The Plan contemplates and creates the Trust. Plan § 5.1. The Trust agreement also defines "claim" identically with § 101(5) of the Bankruptcy Code.

20

the "claims" in this case first arose prior to the Sale Order notwithstanding that they may have been asserted postconfirmation when tort claimants first made payment requests or demands upon the various insurance companies, the Debtor, or Michigan Trucking.   In accordance with this court's prior orders, Michigan Trucking is not liable for pre-closing sale obligations nor is it obligated to pay the related and coextensive debts, whether to the tort claimants or the insurance companies for the deductible amounts.[9]

Another second and distinct analysis yields the same result.   "In interpreting a confirmed plan, courts use contract principles, since the plan is effectively a new contract between the debtor and its creditors." Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.), 456 F.3d 668, 676 (6th Cir. 2006), cert. denied, 549 U.S. 1317, 127 S.Ct. 1874 (2007).   When interpreting the confirmed plan, a court should utilize state law "under long-settled contract law principles." Id.   Absent ambiguity, the plan "is to be enforced as written, regardless of whether it is in line with parties' prior obligations." Id.

In this case, the Confirmation Order, the Plan, the Sale Order, the APA, and the Schedules to the APA are all intertwined.   When there exist multiple documents or writings tied together, all writings must be considered and interpreted as a single package. Wonderland Shopping Ctr. Venture Ltd. P'ship. v. CDC Mortg. Capital, Inc., 274 F.3d 1085, 1092 (6th Cir. 2001) ("The court

---

[9]   Michigan Trucking is responsible to "administer" the insurance claims for the policy year in question, June 1, 2009 to May 31, 2010, but this is *not* tantamount to paying related losses or deductible amounts out of its own pocket.

21

examines the contract as a whole, giving effect to all parts and language of a written agreement according to their 'ordinary and natural meaning.'"); accord Anton v. National Union Fire Ins. Co., 634 F.3d 364, 367 (6th Cir. 2011) ("Michigan has long adhered to the common sense position that an interpretation of a contract   . . . should give effect to all of its provisions.   This means examining the contract as a whole.") (citations omitted). "When the written agreement refers to a separate document for additional contract terms, the court must read the writings together." Wonderland Shopping Ctr., 274 F.3d at 1092 (citing Forge v. Smith, 458 Mich. 198, 580 N.W.2d 876, 881 (1998)). When the parties' intent is clear from unambiguous language, the court enforces what is expressed in the writing or intertwined writings. Id. (citing Birchcrest Bldg. Co. v. Plaskove, 369 Mich. 631, 102 N.W.2d 819, 823 (1963)).

This court finds no ambiguity in the interrelated writings. The Confirmation Order, the Plan, the Sale Order and the APA, although voluminous and seemingly complicated when taken together, can be readily interpreted in an ordinary and natural manner.   The court has no difficulty in interpreting the combined language in the governing court orders as mandating that Michigan Trucking is *not* liable for claims or obligated to pay any related debts for any and all tort claims, accident liabilities, cargo loss claims or other types of claims that arose from occurrences (or omissions) prior to December 22, 2009, i.e., the closing of the sale.  Although the Trustee attempts to jumble the language of the

22

various interrelated writings and invites the court to make things more complicated than they actually are,[10] the court declines the invitation.

C.      *Is the Liquidation Trustee Bound by Prior Court Orders?*

To determine whether the Liquidation Trustee is bound by the court's prior orders, the Plan, the Confirmation Order, and the Trust document must be read together.   Texas Comptroller of Public Accounts v. Liuzza (In re Texas Pig Stands, Inc.), 610 F.3d 937, 944 (5th Cir. 2010) ("The Plan and Trust Agreement are contracts that must be read in their entirety to be given full meaning.").

In this case, the Plan defines the "Liquidation Trust," the "Liquidation Trust Agreement" and the "Liquidation Trustee."  Plan, §§ 1.61, 1.62 and 1.63.  Also, the Plan creates the Trust and incorporates by reference the Trust Agreement. Plan, § 5.1(a) ("The Liquidation Trust Agreement, a copy of which is attached . . . and all of which terms and conditions are incorporated into the Plan, shall be deemed effective and approved by the Bankruptcy Court.").  Further, the Plan specifically designates the person who will serve as the Liquidation Trustee. Plan, § 5.3(a) ("Barry P. Lefkowitz, CPA, CIRA, will serve as the Liquidation Trustee.").  Further, it is clear that the Plan contemplated the Sale Order, which incorporated the APA, and its provisions.  Plan, § 5.3(f)(ii) ("The Liquidation

---

[10]   Specifically, the Liquidation Trustee relies upon two Sixth Circuit decisions to support his position.  National Union Fire Ins. Co. v. VP Bldgs., Inc., 606 F.3d 835 (6th Cir. 2010); Zurich American Ins. Co. v. Lexington Coal Co. (In re HNRC Dissolution Co.), 536 F.3d 683 (6th Cir. 2008), aff'g 371 B.R. 210 (E.D. Ky. 2007).  These decisions pertain to whether insurance companies are entitled to administrative expense claims, under § 503(b)(1), and do not address whether a buyer of estate assets is liable to pay debts arising before the closing of the sale or before confirmation of a chapter 11 plan.  The court easily discerns that the analysis in VP Buildings and HNRC is inapposite in this adversary proceeding.

23

Trustee has the full power to bring and prosecute [causes of action], *if not part of the Sale . . . .*").

The Trust, in its recitals, cross-references the Plan. "Section 5.1 of the Plan contemplates, among other things, the creation of a liquidation trust. This Trust Agreement is executed to establish the Liquidation Trust and to facilitate implementation of the Trust contemplated under the Plan." Trust, Recitals, ¶ C. It defines the "Liquidation Trust" as the entity created under section 5.01 of the Plan or previously approved by the Bankruptcy Court prior to the Confirmation Hearing.[11]  Trust, Art. I, Definitions, at 7. Like the Plan, the Trust designates Barry P. Lefkowitz as the "Liquidation Trustee." Id.

The Trustee explicitly agreed to be bound by the terms and conditions of the Plan and the Confirmation Order. Trust, § 2.05 ("Acceptance of Liquidation Trust"). The Confirmation Order establishes (or, in this instance, acknowledges) the Liquidation Trust and the grant of authority to the Trustee. Plan, ¶ 47 ("the terms of the Plan and the Confirmation Order shall be deemed binding upon . . . the Liquidation Trust and Liquidation Trustee").

As a matter of binding decisional law, the Liquidation Trustee, as successor in interest to the estate, is in privity and is bound by this court's prior orders. Browning v. Levy, 283 F.3d 761, 772 (6th Cir. 2002) (those in privity with

---

[11]  In this case, the court approved the Trust and the selection of the Liquidation Trustee prior to the Confirmation Order pursuant to a joint motion of the Debtors and the Official Committee of Unsecured Creditors. Case Dkt. 1519 (joint motion) and 1669 (order). Creation of the Trust was necessary because the closing of the Sale would occur before confirmation and the carve out was required to be paid to the Liquidation Trustee upon the entry of the Sale Order, as contemplated by the Plan.

the parties are likewise bound by confirmation orders); cf. Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.), 930 F.2d 458, 463 (6th Cir. 1991) (after confirmation of plan and subsequent conversion to chapter 7, trustee was bound by confirmation order and was unable to recover payments made in accordance with confirmed plan, even assuming payments might be legally improper).

Summarizing, the Liquidation Trustee is bound by all prior court orders entered in connection with this case.  The Trustee shall also be bound by this court's interpretation of its prior orders.

D.      Is the Liquidation Trustee's Complaint "Plausible"?

In 2007, in an antitrust case, the Supreme Court adopted a new standard for dismissal under FED. R. CIV. P. 12(b)(6).  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 564, 127 S.Ct. 1955, 1970 (2007) ("we look for plausibility in this complaint").  In Twombly, the Court held that "[b]ecause the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Twombly, 550 U.S. at 570, 127 S.Ct. at 1974.

Two years later, in an action involving an assertion of deprivation of constitutional rights by government officials who relied on the qualified immunity privilege, the Court reiterated the new pleading standard.   "[L]abels and conclusions" based upon some type of "a formulaic recitation of the elements of a cause of action will not do."  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 555, 127 S.Ct. at 1955).  This court believes the new pleading requirement is summarized by the Supreme Court as follows:

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 129 S.Ct. at 1950.

In this case, the Trustee has pleaded almost *no* facts other than quoting or paraphrasing selected court orders and making various conclusory statements asserting that Michigan Trucking must pay vague tort-type liabilities. This is somewhat understandable because the Trustee is requesting the court to interpret its prior orders. Even though the Trustee may be only requesting declaratory relief, *some* facts must be alleged to make the complaint plausible on its face.

In a number of prior adversary proceedings, the court has exercised its discretion to permit plaintiffs to amend facially implausible complaints. However, in this adversary proceeding, the court refuses to do so. First, based upon the unambiguous interpretation of its prior orders, the Trustee is not entitled to the declaratory relief sought. Second, the court has reviewed the documents in the Trustee's Supplement. (See note 5 above.) *Considering the Supplement, and all types of claims, demands, correspondence, checks, faxes, and other documents, and placing them in the context of the complaint, there is nothing "plausible" to support the Trustee's position.* Michigan Trucking's Motion to Dismiss is well taken.

## V. CONCLUSION.

The Liquidation Trustee has failed to state a valid cause of action. Michigan Trucking is not obligated to pay any obligations which arose prior to

26

closing of the sale, such as tort obligations, accident claims, and cargo loss damages. Further, Michigan Trucking is not obligated to pay any deductible amounts to insurance companies regarding those types of claims, even in instances when demands or requests for payment were not first made until after closing of the Sale.[12]

The Trustee's complaint shall be dismissed with prejudice. A separate order shall be entered.

Honorable James D. Gregg
Chief United States Bankruptcy Judge

Dated this 6th day of
May, 2011
at Grand Rapids, Michigan

---

[12]   This opinion determines that Michigan Trucking is not obligated to pay these claims. The court is *not* called upon in this adversary proceeding to declare *who* is responsible to pay these types of claims. That will wait for another day.